**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| EMILY BOLASKI, O/B/O RALPH MILLS (DECEASED); | CASE NO. 1:23-CV-02056-DAP |
| Plaintiff, | DISTRICT JUDGE DAN AARON POLSTER |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Emily Bolaski on behalf of Ralph Mills ("Plaintiff" or "Mr. Mills") seeks

judicial review of the final decision of Defendant Commissioner of Social Security

("Commissioner") denying Mr. Mills's application for Disability Insurance Benefits ("DIB").

(ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been

referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to

Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the final

decision of the Commissioner be AFFIRMED.

## I.    Procedural History

Mr. Mills filed an application for disability insurance benefits ("DIB") on April 21, 2021,

alleging disability beginning May 1, 2020.  (Tr. 17, 159.)  He alleged disability due to fusion of

lumbar spine, peripheral neuropathy, polymyopathy rheumatitis, coronary artery disease, and

chronic pain.  (Tr. 45.)  His application was denied at the initial level (*id*.) and upon

reconsideration (Tr. 54) after which Mr. Mills requested a hearing before an ALJ (Tr. 74).  While

1

Mr. Mills was awaiting his hearing, he suffered cardiac arrest and passed away on July 1, 2022. (Tr. 264.)  His daughter, Emily Bolaski, was substituted as the party before the agency and waived her right to appear at the hearing.  (Tr. 141.)

A telephonic hearing was held before an ALJ on September 21, 2022 (Tr. 33-52), and the ALJ issued an unfavorable decision on October 12, 2022 (Tr. 17-28; *see* Tr. 264).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review in August 2023.  (Tr. 1.)  Plaintiff filed a Complaint seeking judicial review on October 19, 2023 (ECF Doc. 1), and the matter is fully briefed and ripe for review (ECF Docs. 8, 10).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Mr. Mills was born in 1961 and was 58 years old on the alleged disability onset date, making him a person of advanced age under Social Security regulations on the alleged onset date.  (Tr. 348.)  He had at least a high school education.  (Tr. 658.)  Mr. Mills had past relevant work as an automobile salesperson.  (Tr. 659.)

### B.     Medical Evidence

Although the ALJ identified numerous medically determinable impairments, both severe and non-severe (Tr. 19-21), Plaintiff's arguments focus on Mr. Mills's mental impairments and the testimony of the vocational expert (*see* ECF Doc. 8).  The evidence summarized herein is therefore focused on the evidence relevant to the mental impairments and vocational testimony.

#### 1.     Relevant Treatment History

During the relevant period, Mr. Mills sought treatment for chronic pain related to his back (*see, e.g.*, Tr. 330, 333, 335), neck (*see, e.g.*, Tr. 317-319), and shoulder (*see, e.g.*, Tr. 338).  He also sought treatment for a chronic cough (*see, e.g.*, Tr. 722) and cardiac concerns (*see, e.g.*,

Tr. 702-05 (diagnosed with ischemic heart disease).)  At times during medical treatment for these issues, Mr. Mills reported, or providers noted, symptoms related to his mental state.  (*See, e.g.*, Tr. 704 (cardiologist noted that Mr. Mills was "anxious with several psycho-social stressors which undoubtedly are affecting his heart rate").)  Mr. Mills did not pursue treatment with any mental health treatment providers during the relevant period.  (*See* Tr. 660.)

At some appointments for his physical impairments, mental status findings noted that Mr. Mills appeared anxious.  (*See, e.g.,* Tr. 335 (10/20/2020 pain management); Tr. 345 (8/18/2020 pain management); Tr. 724 (3/15/2020 otolaryngology); Tr. 788 (2/15/2022 otolaryngology).) His mental status findings were otherwise unremarkable, and he was alert and oriented, in no acute distress, and with a euthymic mood.  (*See, e.g.*, Tr. 335 (10/20/2020 pain management); Tr. 345 (8/18/2020 pain management); Tr. 317-19 (5/17/2021 pain management), Tr. 342 (8/25/2020 pain management); Tr. 349-50 (6/22/2020 pain management, denied uncontrolled depression or anxiety); Tr. 358 (1/21/2020 pain management).)  While Mr. Mills sometimes denied psychiatric or behavioral problems, he sometimes reported depression. (*See, e.g.*, Tr. 301 (9/25/2020 primary care); Tr. 329 (2/23/21 pain management); Tr. 335 (10/20/2020 pain management); Tr. 341 (8/25/2020 pain management); Tr. 345 (8/18/2020 pain management); Tr. 349 (6/22/2020 pain management); *but see* Tr. 332 (10/20/2020 pain management—reporting depression); Tr. 358 (1/21/2020 pain management—reporting depression).)

Specific medical appointments in which Mr. Mills reported, or was observed to demonstrate, anxiety or depression—as identified in the parties' briefs—are summarized below.

At a September 23, 2019 emergency department visit for progressive worsening shoulder and hip pain, Mr. Mills "appeared very anxious during triage."  (Tr. 383.)  His mental status examination revealed that he appeared anxious, but was otherwise oriented to person, place, and

time, and had a normal mood, affect, and behavior. (Tr. 384.) He was not noted to have psychosocial needs at that time. (Tr. 387.) He was admitted to the hospital for further workup, with admitting diagnoses of weakness and myalgias. (Tr. 388.)

He was admitted to the hospital from September 23 to 28, 2019 for acute on chronic pain, and then was discharged home in stable condition. (Tr. 417.) On September 25, 2019, Christina Allyn, LISW, performed a psychiatric consultation and substance abuse assessment. (Tr. 406-07.) She noted that Mr. Mills appeared alert and oriented x3, but with an irritable mood and avoidant eye contact. (Tr. 406.) He was frustrated with pain management and "hyper focused on this without [being] willing to discuss [his alcohol] use." (*Id.*) He reported drinking two drinks daily after work due to his pain. (*Id.*) He raised his voice, saying "someone has to do something." (Tr. 407.) LISW Allyn noted his anxiety might be from pain or alcohol withdrawal. (*Id*.) Diamon Roseberry, RN, noted on the same day that Mr. Mills was anxious, agitated, and upset about pain, with visible tremors and high anxiety. (Tr. 409.)

On September 26, 2019, while Mr. Mills was still hospitalized, he was seen for a psychiatry consultation with Lara Feldman, D.O. (Tr. 411-14.) He reported that he was unable to function due to chronic pain, and admitted depression due to this pain. (Tr. 412.) He was taking time-release Vicodin daily and had been "on chronic opiates for 20 years." (*Id.*) He presented with a depressed, restricted mood on examination, but other findings were unremarkable, including: appropriate, relaxed demeanor; good eye contact; and appropriate thought content, insight, and judgment. (Tr. 412-13.) Dr. Feldman diagnosed polysubstance use disorder, opiate disorder, alcohol use disorder, and chronic pain syndrome. (Tr. 411.) She recommended that Mr. Mills discontinue Ativan, increase Neurontin, and start Cymbalta and

4

Seroquel; she also referred him to a chronic pain program, noted that Dr. Chaitoff would consider suboxone for his history of opiate use, and noted that he "needs detox."  (Tr. 412.)

Mr. Mills continued treating with Cleveland Clinic Pain Management after his hospitalization.  (*See, e.g.,* Tr. 377-79 (10/1/19 office visit); Tr. 353-56 (3/24/20 office visit); Tr. 340-42 (8/25/20 office visit).)

On September 2, 2020, Mr. Mills saw Jeffrey Chaitoff, M.D., for adhesive capsulitis of the right shoulder and bilateral shoulder pain.  (Tr. 338-40.)  On examination, Mr. Mills's speech was lucid and fluent, and his eye contact was good.  (Tr. 339.)  Dr. Chaitoff administered a corticosteroid injection to the right shoulder, but noted that Mr. Mills declined duloxetine and antidepressants, saying "I have that at home."  (Tr. 338, 340.)

The records for a February 23, 2021 pain management visit with Riad Laham, M.D., note that Mr. Mills had a history of anxiety and peripheral neuropathy.  (Tr. 328.)  He was not working after losing his job as a used car salesman and had recently stopped methadone due to nausea.  (*Id.*)  On examination, he was oriented x3 with no acute distress and a euthymic mood.  (Tr. 329.)  Dr. Laham continued his prescriptions for Neurontin, Flexeril, and Zanaflex, and recommended that he stay away from opiates altogether in light of his GI issues.  (Tr. 330.)

On November 9, 2021, Mr. Mills attended a cardiac follow-up visit with Dr. Zellers for arteriosclerotic heart disease.  (Tr. 702-04.)  Mr. Mills was given a depression screening, and scored 0, indicating no depression symptoms.  (Tr. 702.)  Dr. Zellers noted that Mr. Mills had followed "very loosely" with his cardiac practice, having last been seen in September 2020, and was "doing well from a cardiac standpoint."  (Tr. 703.)   Mr. Mills denied exertional chest pain and had no lower extremity swelling, but did report some mild dyspnea and easy fatigability. (*Id.*)  He was off opiates.  (*Id.*)  He reported episodes starting about two months prior, where he

would feel his lips and throat go numb, then would cough, and finally had tingling in his chest and left arm.  (*Id.*)  Dr. Zellers indicated that "the episodes he speaks of sound neuromuscular," and noted that Mr. Mills was "anxious with several psycho-social stressors which undoubtedly [are] affecting his heart rate." (Tr. 704.)

Mr. Mills received sutures for a forehead laceration and an emergency room visit for a fall in February 2022 (Tr. 740, 758), and had the sutures successfully removed at Cleveland Clinic—Mentor Center Street on March 3, 2022 (Tr. 740-42).  He completed a depression screening at that visit, with a PHQ-9 score of 7.[1]  (Tr. 744-45.)

On March 15, 2022, Mr. Mills returned for an otolaryngology follow-up with Rebecca Chota Nelson, M.D., following a referral for vocal fold leukoplakia.  (Tr. 722-725.)  Mr. Mills had switched from lisinopril to losartan and his cough was notably better, although he still had some significant coughing.  (Tr. 722.)  He reported that he had stopped taking chronic pain medication, but admitted to significant alcohol use, drinking "1 pint of vodka per day." (*Id.*)  He had no interest in stopping his alcohol use and did not want a referral to assist in stopping; he felt the alcohol helped his cough.  (*Id.*)  On examination, he appeared comfortable and in no acute distress, but also appeared "anxious and shaky."  (Tr. 724.)  Dr. Nelson counseled Mr. Mills on his alcohol use but observed that he was "in the precontemplative phase of quitting, and declined possible referral for help," feeling the alcohol benefitted his cough; Dr. Nelson was concerned that his alcohol use may be provoking significant reflux to worsen his cough.  (Tr. 725.)  She referred Mr. Mills to voice therapy and advised him to return in 4-6 weeks.  (*Id.*)

---

[1] This score is indicative of mild depression. *See Wolters Kluwer-Clinical Decision Support*, Depression Screening by a Nine-Item Patient Health Questionnaire (PHQ-9) in Adults, available at: https://www.uptodate.com/contents/calculator-depression-screening-by-a-nine-item-patient-health-questionnaire-phq-9-in-adults (last visited September 12, 2024).

On June 12, 2022, Mr. Mills was admitted to the LakeHealth West Medical Center for generalized weakness, chest pain, and alcohol abuse with withdrawal delirium. (Tr. 815, 821.) He reported fluctuating blood pressures and said he had been drinking two to three ounces of alcohol per day, with his last drink two days earlier.  (Tr. 824; *but see* Tr. 834 (reporting 6 ounces of vodka daily during same hospital stay).)  He was treated for alcohol withdrawal and alcoholic hepatitis, cleared by cardiology, and discharged home in stable condition on June 18, 2022, and was advised to quit smoking and drinking.  (Tr. 855.)

During his June 2022 hospitalization, Mr. Mills attended a psychiatric consultation for alcohol dependence with Kelley Sega, CNP.  (Tr. 832-40.)  He reported drinking heavily on and off for 20 years, with his longest period of sobriety being six months after back surgery.  (Tr. 832.)  His most recent relapse was in 2020, when he began drinking again due to an increase in life stressors; he lost his job due to Covid-19, lost his insurance, and ultimately had to stop all of his pain management prescriptions "cold turkey" as a result.  (*Id.*)  He began drinking due to significant withdrawal symptoms from his pain management medications, but said he measured his alcohol intake daily—6 oz. of vodka per day—so that he would not drink too much.  (*Id.*)  His last drink was four days prior.  (*Id.*)  He reported that "he often experience[ed] shaking, [headaches], nausea, tactile hallucinations, and increased anxiety when he stop[ed] drinking," and was unable to cut back on his alcohol intake because of those symptoms.  (*Id.*)  He also reported often struggling with anxiety over the past two years, worrying "about everything," but denied feelings of depression or decrease in concentration.  (Tr. 832-33.)  CNP Sega noted that staff reported Mr. Mills was having moderate withdrawal symptoms; he would deny sweating despite profuse sweating, and would deny hallucinations despite reporting a "man with horns" outside his room.  (Tr. 833.)  Staff reported he was also "restless at times, bordering on agitated."

(*Id.*)  On examination, Mr. Mills was alert, oriented, cooperative, and relaxed, with direct eye contact, but had tremors and his gait was unsteady.  (Tr. 838-39.)  His affect was appropriate, his speech and thought processes coherent and logical, his thought content normal, and his memory and judgment intact; but he appeared anxious and was easily distracted.  (Tr. 839.)  CNP Sega diagnosed Mr. Mills with alcohol dependence, anxiety, and insomnia.  (Tr. 840.)  She continued his medications for alcohol dependence and insomnia and prescribed Zoloft for anxiety.  (*Id.*)

### 2. Opinion Evidence

#### i. Consultative Psychological Examiner

On September 16, 2021, Mr. Mills underwent a consultative psychological evaluation with Natalie Whitlow, Ph.D.  (Tr. 657-664.)  He was referred by the Ohio Division of Disability Determination for "evaluation of the presence or absence of a mental disorder" in order to evaluate whether, if present, any mental disorder limited his work ability.  (Tr. 657.)  Mr. Mills reported that "insomnia ke[pt] [him] from working because [he slept] three hours a day and [it was] really trying on [his] body to not get any sleep," and that he couldn't "shut [his] mind off," but he said that his "main thing" was pain in his shoulders, back, legs, neck and mouth.  (Tr. 658.)  He explained that his lack of sleep was due to the pain.  (Tr. 660.)   He further stated that finances and pain limited his ability to be social and out in public.  (*Id.*)  Mr. Mills reported that he lived alone, was very limited in his ability to do household chores, and received financial help from his mom, but was capable of managing his finances.  (*Id.*)  Mr. Mills "denied that he experience[d] any mental health symptoms that impair[ed] his working ability," "did not present with mental health signs," and "denied having a history of mental health hospitalizations."  (*Id.*)

On examination, Mr. Mills was adequately groomed, maintained appropriate eye contact, and was alert, attentive, cooperative, and coherent, but Dr. Whitlow observed:

8

> [O]ur evaluation was repeatedly interrupted because he would go into coughing fits and would need to step out of the office to remove his mas[k] to cough and drink. The claimant had small scars and scabs all over his arms and legs. The claimant displayed hand shaking and trembling.

(Tr. 660-61.)  His speech and thought processing appeared to be within the normative range of functioning, and he did not identify any limitations in this area.  (Tr. 661.)  His affect was stable and appropriate, and he denied any mood-related symptoms that impaired his working ability.  (*Id.*)  He did not present with any signs of anxiety during the evaluation, and denied experiencing anxiety symptoms that impaired his working ability.  (*Id.*)  He appeared to possess average cognitive functioning and fair insight and judgment.  (Tr. 661-62.)

Based on her examination, Dr. Whitlow did not identify any applicable DSM-5 mental health diagnoses.  (Tr. 662.)  She therefore opined that Mills did not appear to have limitations "for a mental health perspective" in: understanding, remembering, and carrying out instructions; maintaining attention and concentration, persistence, and pace to perform simple and multi-step tasks; responding appropriately to supervision and to coworkers in a work setting; and responding appropriately to work pressures in a work setting.  (Tr. 663-64.)

### ii.      State Agency Medical Consultants

At the initial level, on September 22, 2021, state agency psychological consultant Leslie Rudy, Ph.D., found that the available evidence did not establish a medically determinable mental impairment.  (Tr. 47-48.)  Upon reconsideration, on December 31, 2021, state agency psychological consultant Audrey Todd, Ph.D., affirmed Dr. Rudy's finding.  (Tr. 57.)

### C.      Adult Function Report

Mr. Mills completed a function report on June 25, 2021.  (Tr. 194-201.)   He reported that he lived in an apartment by himself.  (Tr. 194).  He had no memory or attention span and was very quick tempered (*id*.), but was able to pay bills, count change, handle a saving account, and

use a checkbook and money orders (Tr. 197). He also reported spending time with others in person and on the phone, although he had "no desire to interact with others." (Tr. 198.) He said could pay attention for about twenty minutes at a time, that he had a fair ability to follow written and spoken instructions and got along with authority figures "ok," but he did not handle stress or changes in routine "well anymore." (Tr. 200.)

> ### D. Hearing Testimony

Mr. Mills passed away before his September 21, 2022 hearing (Tr. 264) and the substitute claimant waived attendance at the hearing (Tr. 141). A Vocational Expert ("VE") testified at the hearing, classifying Mr. Mills's past relevant work as: "Salesperson, Automobiles, DOT 273.353010, SVP light (skilled), light in physical demand." (Tr. 39-40.) The VE also testified that a hypothetical individual of Mr. Mills's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could perform Mr. Mills's past work as an automobile salesperson. (Tr. 40-41.) Plaintiff's attorney did not object to the qualifications of the VE. (Tr. 39-40; *see also* Tr. 266-67 (curriculum vitae).)

Plaintiff's attorney asked the VE: "does the auto sales job typically involve driving automobiles?" (Tr. 42.) The VE testified, based on her "experience and observation of the [automobile salesperson] position," that:

> It's been my experience that no, the automobile salesperson is dealing with the customers and the sales. They might do riding along in a vehicle if someone wanted to do a test drive. But typically, these places have staff on board to move any vehicles or bring the vehicles to the customer.

(*Id*.) The attorney asked whether a person in that job would have to "move cars around or go get a car that a customer wanted to test drive," and the VE responded:

> Typically, no. I mean it might happen on an occasional basis, but I would not include that as part of the job description.

10

(Tr. 42-43).  Finally, the attorney asked whether an automobile sales representative at a dealership would "ever have to go in the back to the service department, or be around . . . automobile lifts, or large machinery, typically involved in . . . the service departments of automobile dealerships."  (Tr. 43.)  The VE responded: "Not in my opinion, no."  (*Id.*)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant

11

work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.     The ALJ's Decision

In her October 12, 2022 decision, the ALJ made the following findings:[2]

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.  (Tr. 19.)

2.     The claimant had not engaged in substantial gainful activity since May 1, 2020, the alleged onset date.  (*Id.*)

3.     The claimant had the following severe impairments: hypertension, hyperlipidemia, neuropathy, obesity, coronary artery disease status post stenting, ischemic cardiomyopathy, status post myocardial infarction, post-laminectomy syndrome, cervical degenerative disc disease, and carpal tunnel syndrome.  (Tr. 19-20.)

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 21.)

5.     The claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) from the alleged onset date through the date of his death except: he could never climb ladders, ropes, or scaffolds. He could occasionally climb ramps and stairs. He could occasionally stoop,

---

[2] The ALJ's findings are summarized.

crouch, or crawl. He could frequently balance or kneel. He should avoid heavy machinery and unprotected heights. He could perform frequently handling and occasional fingering with the bilateral upper extremities. (Tr. 23.)

6.      The claimant was capable of performing past relevant work. (Tr. 27.)

Based on the foregoing, the ALJ determined that Mr. Mills had not been under a disability, as defined in the Social Security Act, from November 15, 2017, through his death on July 1, 2022. (Tr. 28.)

## V.      Plaintiff's Arguments

Plaintiff asserts two assignments of error. First, Plaintiff argues that the ALJ failed to adequately consider Mr. Mills's mental impairments at Step Two of the sequential evaluation. (ECF Doc. 8, pp. 1, 9-12.) Second, Plaintiff argues that the ALJ's reliance on the VE's testimony in finding Mr. Mills capable of performing his past relevant work was not supported by substantial evidence. (*Id.* at pp. 1, 13-17.)

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

14

**A.** **First Assignment of Error: Whether ALJ Erred in Considering Mental Health Impairments at Step Two**

Plaintiff argues that the ALJ erred at Step Two of the sequential analysis because she failed to adequately consider Mr. Mills's mental impairments and lacked substantial evidence to support her finding that the mental impairments were non-severe. (ECF Doc. 8, pp. 9, 12.) The Commissioner argues in response that it is irrelevant that the ALJ found no severe mental impairments because the ALJ "found [Mr.] Mills had other severe impairments and considered [his] non-severe mental impairment in assessing the RFC." (ECF Doc. 10, p. 7.) The Commissioner further argues that the ALJ's decision should be affirmed because her "decision to include no mental limitation in the RFC is supported by substantial evidence." (*Id.*)

**1.** **Analysis for Step Two Determinations**

A claimant bears the burden of showing the severity of her impairments. *Foster v. Sec'y of Health & Hum. Servs.*, 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (*citing Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986)). A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities." *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330–32 (6th Cir. 2001).

The Sixth Circuit has construed Step Two as a de minimis hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (*quoting Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985)). Although the standard is de minimis, it is recognized

15

that a diagnosis alone "says nothing about the severity of the condition."  *Higgs*, 880 F.2d at 863;
*see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere
existence of those impairments, however, does not establish that [claimant] was significantly
limited from performing basic work activities for a continuous period of time.").

Where, as here, an ALJ has identified both severe and non-severe impairments, the Sixth
Circuit has held that it was not reversible error for an ALJ to find impairments non-severe since
the Commissioner may still consider the non-severe impairments in assessing the RFC.  *See
Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Anthony*,
266 F. App'x at 457 (finding it "legally irrelevant" that some impairments were not deemed
severe where the designation of other impairments as severe "cleared step two of the analysis"
and thus caused the ALJ to consider both "severe and nonsevere impairments in the remaining
steps of the sequential analysis"); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir.
2003) (finding "the question of whether the ALJ characterized any other alleged impairment as
severe or not severe is of little consequence" when ALJ found a severe impairment at step two).

But the Sixth Circuit has indicated it may be reversible error if an ALJ fails to consider
non-severe impairments in assessing the RFC.  *See Simpson v. Comm'r of Soc. Sec.,* 344 F.
App'x 181, 190–191 (6th Cir. 2009) (distinguishing *Maziarz* and finding reversible error when
an ALJ found a non-severe mental impairment "would not be considered in assessing her RFC");
*compare Pompa,* 73 F. App'x at 803 (applying harmless error standard where "ALJ considered
all of [plaintiff]'s impairments in her residual functional capacity assessment finding").

Here, the ALJ found that depression was a medically determinable impairment but held
that Mr. Mills's depression "did not cause more than minimal limitation[s] in [his] ability to
perform basic mental work activities and [wa]s therefore non-severe."  (Tr. 20.)  Nevertheless,

16

the ALJ noted that "all the claimant's medically determinable impairments, including those that are not severe" were considered in her assessment of Mr. Mills's RFC.  (*Id.*)  Having found depression to be a non-severe impairment at Step Two, the ALJ then adopted an RFC at Step Four that did not incorporate mental functional limitations.  (Tr. 23.)

Because the ALJ considered Mr. Mills's non-severe depression in assessing the RFC but did not adopt related RFC limitations, the question before this court is "whether the ALJ's decision not to find any limitations arising from the condition in question is supported by substantial evidence."  *Baumiller v. Comm'r of Soc. Sec. Admin.*, 627 F. Supp. 3d 885, 906 (N.D. Ohio 2022) (citation and internal quotation marks omitted); *see also Simpson*, 344 F. App'x at 190-191 (finding ALJ lacked substantial evidence to find no mental limitations after relying on "a clear mischaracterization of the facts"); *White v. Comm'r of Soc. Sec.,* 312 F. App'x 779, 787–88 (6th Cir. 2009) (finding ALJ lacked substantial evidence to support no mental limitations after mischaracterizing evidence and misstating the treating doctor's findings).  The undersigned therefore turns to whether the Step Two findings were supported by substantial evidence.

### 2.    Whether Substantial Evidence Supported Finding that Mental Impairments Were Non-Severe and Caused No Functional Limitations

Plaintiff argues that the ALJ's finding that Mr. Mills's mental impairments are non-severe lacks the support of substantial evidence because the ALJ: relied exclusively on the consultative examiner's report; failed to consider any other evidence of the mental impairments that suggested greater limitations; and did not address evidence of Mr. Mills's anxiety in her Step Two findings.  (ECF Doc. 8, pp. 9-10.)  She further argues: "the record reflects that [Mr. Mills] consistently reported significant symptoms related to both anxiety and depression, imposing more than a slight or 'minimal' limitation on his ability to perform basic work activities."  (*Id.* at p. 10.)  The Commissioner responds by arguing that the Step Two findings were supported by

17

substantial evidence, which included: the medical opinions of the state agency psychological consultants and consultative examiner; Mr. Mills's reports to providers that he had no mental health symptoms; and the evidence suggesting that Mr. Mills left his last job for reasons unrelated to his mental impairments.  (ECF Doc. 10, pp. 8-9.)  "[B]y merely pointing to other, potentially conflicting evidence," the Commissioner argues that "Plaintiff is improperly requesting this Court reweigh the evidence."  (*Id.* at p. 9.)

After finding that Mr. Mills's depression did not cause more than minimal limitations in his ability to perform basic work activities at Step Two, the ALJ made the following additional findings regarding Mr. Mills's level of functioning in the four areas of mental functioning:

> The first functional area is understanding, remembering, or applying information. In this area, the claimant had no limitation. He dropped out of high school in his senior year but earned his diploma two years later (Ex. 4F/4). He denied a history of special education or any learning or intellectual disability. He received an honorable discharge from the Marines after six months.
>
> The next functional area is interacting with others. In this area, the claimant had no limitation. He was married and divorced once and had three adult children (Ex. 4F/2).
>
> The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant had mild limitation. <u>He denied any mental health symptoms and denied a history of mental health hospitalizations</u> (Ex. 4F/5). He reported he slept only three hours per day due to pain. <u>He had difficulties with his memory, attention span, and was "very quick tempered"</u> (Ex. 4E/1).
>
> The fourth functional area is adapting or managing oneself. In this area, the claimant had mild limitation. He ate two meals per day (Ex. 4F/5). He was spending money from his 401K for living expenses.

(Tr. 20 (citing Tr. 194 (function report); Tr. 657, 659, 660 (CE report)) (emphasis added).)

The ALJ returned to a discussion of Mr. Mills's self-reported difficulties with memory, attention span, and temper at Step Four, but found that his "statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence" in part because:

> [T]he evidence showed that he was capable of performing his past relevant work up until the time of his death. <u>He reported that he was last employed as a used car salesman but was laid off due to the pandemic</u> (Ex. 4F/4). He tried working for other dealerships, but nothing had worked out. . . . <u>He denied any mental health symptoms and denied a history of mental health hospitalizations</u> (Ex. 4F/5). He was drinking a pint of vodka daily (Ex. 8F/4).

(Tr. 24 (citing Tr. 659-60 (CE report); Tr. 722 (3/15/22 otolaryngology visit)) (emphasis added).)

The ALJ's subsequent discussion of the medical records noted Mr. Mills's own reports that he stopped working due to the pandemic (Tr. 25 (citing Tr. 287, 659)), his denial of mental health symptoms and a history of mental health hospitalizations (Tr. 26 (citing Tr. 660)), and his reports of drinking a pint of vodka and/or 180 milliliters of alcohol daily (*id.* (citing Tr. 722, 816)).  In discussing the consultative examination findings in particular, the ALJ explained:

> The claimant underwent a psychological consultative examination with Natalie Whitlow, Ph.D. on September 16, 2021 [].  He stated that he was applying for disability due to idiopathic peripheral neuropathy, a lower fusion with a cage in his back, arthritis in his upper back and neck, tremors in his legs, polymyopathy rheumatitis in his shoulders, and insomnia.  He was born and raised in Ohio and earned his high school diploma.  He reported a good childhood, but his father was abusive toward his mother.  He was married and divorced once and had three adult children.  He dropped out of high school in his senior year but earned his diploma two years later [].  He denied a history of special education or any learning or intellectual disability.  He received an honorable discharge from the Marines after six months.  <u>He reported that he was last employed as a used car salesman but was laid off due to the pandemic.  He tried working for other dealerships, but nothing had worked out.</u>
>
> <u>He denied any mental health symptoms and denied a history of mental health hospitalizations</u> []. He reported he slept only three hours per day due to pain.  He ate two meals per day.  He was spending money from his 401K for living expenses.
>
> The evaluation was interrupted repeatedly due to the claimant's coughing fits, and he would need to step out of the office to remove his mask and drink water.  He had small scars and scabs all over his arms and legs.  His hands were shaking and trembling during the evaluation []. His speech and thought processing were within the normative range [].  He appeared to have fair insight and judgment [].  <u>Dr. Whitlow declined to diagnosis the claimant with a mental health impairment</u> [].

(Tr. 25-26 (citations omitted) (emphasis added).)  She went on to discuss the persuasiveness of the opinion of the consultative examiner as follows:

>On September 16, 2021, <u>Dr. Whitlow opined that the claimant did not appear to have any mental health limitations</u> [].  This opinion was persuasive to the extent that the evidence overall supported that the claimant's allegations of depression were non-severe.  He denied any mental health symptoms and denied a history of mental health hospitalizations [].  He was drinking a pint of vodka daily [].

(Tr. 27 (citations omitted) (emphasis added).)  The ALJ made similar findings with respect to the persuasiveness of the state agency psychological consultants' opinions that Mr. Mills did not have any medically determinable mental impairments, finding those opinions "persuasive to the extent that the claimant [ha]d no *severe* mental impairments."  (*Id.* (emphasis added).)

Thus, it is clear that the ALJ did not rely exclusively on the CE report in finding Mr. Mills's depression non-severe, as Plaintiff argues.  (ECF Doc. 8, p. 9.)  Instead, a review of the decision reveals that the ALJ considered Mr. Mills's denial of mental health symptoms and lack of mental health hospitalizations, Dr. Whitlow's decision not to diagnose a mental health impairment following a clinical examination and opinion that Mr. Mills did not have mental health limitations, the opinions of the state agency psychological consultants that Mr. Mills did not have any medically determinable mental impairments, the circumstances in which Mr. Mills stopped working (being laid off, rather than leaving due to impairments), and Mr. Mills's significant use of alcohol on a daily basis.  These findings also make it clear that the record does not support Plaintiff's additional assertion that "the record reflects that [Mr. Mills] consistently reported significant symptoms related to both anxiety and depression."  (*Id.* at p. 10.)  On the contrary, and as the ALJ pointed out, Mr. Mills sometimes reported just the opposite.

Plaintiff also cites to certain evidence indicating that Mr. Mills sometimes presented to providers as anxious, easily distracted, and/or with trembling or tremors, and sometimes took medications for his mental health impairments.  (*Id.* at pp. 10-12 (citing records).)  Based on a consideration of this additional evidence, Plaintiff argues that the ALJ's classification of Mr. Mills's depression as non-severe was "not supported by substantial evidence."  (*Id.* at p. 12.)

20

The Commissioner asserts in response that this argument amounts to an improper request for the court to reweigh the evidence. (ECF Doc. 10, p. 9.)

In reviewing the cited records, the undersigned notes that references to an anxious mood in examination findings were generally accompanied by otherwise normal mental status findings. (*See e.g.,* Tr. 335, 317-19, 342, 349-50, 358.) The records also include additional instances, consistent with Dr. Whitlow's observations, where Mr. Mills denied psychiatric symptoms or described only limited symptomatology. (*See, e.g.*, Tr. 702 (11/9/2021 depression screening was zero); Tr. 745 (3/3/2022 depression screening was 7: mild depression); Tr. 877 (denied psychiatric symptoms but presented with moderate alcohol withdrawal symptoms).)

The records highlighted by Plaintiff also describe situations where Mr. Mills presented as anxious in situations involving pain and/or alcohol withdrawal. In September 2019, he was anxious when he was hospitalized for "acute on chronic pain," but LISW Allyn performed a substance abuse assessment and concluded that his anxiety might relate to pain or alcohol withdrawal. (Tr. 383, 384, 406-07, 417.) His diagnoses included polysubstance use disorder, opiate disorder, alcohol use disorder, and chronic pain syndrome, and his plan included mental health medications, suboxone, and detox. (Tr. 411-12.) In March 2022, he appeared to be anxious and shaky at an otolaryngology follow-up where he reported drinking 1 pint of vodka daily and expressed no interest in stopping his alcohol use. (Tr. 722-25.) In June 2022, he was anxious and easily distracted, with tremors and an unsteady gait, when he was hospitalized for chest pain, alcohol withdrawal, and alcoholic hepatitis. (Tr. 815, 821, 838-39, 855.) He reported struggling with anxiety for two years. (Tr. 832-33.) But he also reported drinking 6 oz. of vodka daily and said he experienced shaking, headaches, nausea, hallucinations, and increased anxiety when he stopped drinking, so that he was unable to cut back on his alcohol intake. (Tr. 832.) He

demonstrated moderate alcohol withdrawal symptoms (Tr. 833), and was diagnosed with alcohol dependence, anxiety, and insomnia (Tr. 840).

Although the ALJ did not explicitly discuss all of the findings in the above records, she did highlight Mr. Mills's denial and lack of mental health symptoms and treatment, and his significant daily alcohol intake, to support her RFC findings at Step Four.  (Tr. 24, 26, 27.)  It is well-settled that "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (quoting *Loral Defense Systems–Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir. 1999)).  The record thus does not suggest that the ALJ mischaracterized or failed to consider material evidence, and the evidence cited by Plaintiff does not require a finding that the Step Two determination lacked the support of substantial evidence.

In any event, even if the records cited by Plaintiff could support a finding that the mental health impairments were severe, it is not for the undersigned to reweigh the evidence.  *See Preston v. Comm'r of Soc. Sec.*, No. 22-4026, 2023 WL 4080104, at *3 (6th Cir. June 20, 2023) ("[t]he existence of potentially conflicting evidence is immaterial so long as substantial evidence supports an ALJ's determination." (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)).  "The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (internal quotation omitted).

For the reasons stated above, the undersigned finds that Plaintiff has not met her burden to show that the ALJ lacked substantial evidence to support her finding that Mr. Mills's mental impairments were non-severe and did not cause more than minimal functional limitations.  Accordingly, the undersigned finds the first assignment of error to be without merit.

**B.     Second Assignment of Error: Whether the ALJ Erred by Failing to Resolve an Inconsistency Between VE Testimony and the DOT Under SSR 00-4p**

Mr. Mills also argues that the ALJ erred by failing to comply with SSR 00-4p because there was an unresolved conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT") definition of Mr. Mills's past relevant work.  (ECF Doc. 8, pp. 13-14.)

The DOT sets forth the "maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings."  SSR 00-4p, 65 Fed. Reg. 75759-01, 75760 (Dec. 4, 2000).  When there is a conflict between the DOT definition and a VE's testimony, SSR 00-4p provides:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. . . .
>
> Neither the DOT nor the VE . . . evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

*Id.*  Additionally, SSR 00-4p provides that "[e]vidence from VEs . . . can include information not listed in the DOT" and instructs that a VE's "experience in job placement or career counseling" can form the basis of a reasonable explanation for a conflict.  *Id.*

Thus, when there is an "apparent unresolved conflict" between VE testimony and the DOT, the ALJ must elicit a reasonable explanation for the conflict and then resolve the conflict by determining if the VE's explanation is reasonable and provides a basis for agreeing with the expert rather than the DOT.  SSR 00-4p, 65 Fed. Reg. 75,759 (Dec. 4, 2000).  But an ALJ is not required to base his decision on DOT classifications, and may rely on VE testimony alone.  *See Conn v. Secretary of Health & Human Servs.*, 51 F.3d 607, 610 (6th Cir. 1995) ("[T]he ALJ was within his rights to rely solely on the vocational expert's testimony.  The social security

23

regulations do not require the Commissioner or the VE to rely on classifications in the DOT."); *accord Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (finding ALJ did not err in crediting VE testimony that unskilled claimant could perform jobs classified as "semi-skilled" because the regulations do not "obligate [the ALJ] to rely on [DOT] classifications").

  Plaintiff argues that remand is warranted in this case because the ALJ failed to resolve an inconsistency between the DOT and the VE's testimony.  (ECF Doc. 8, pp. 13-15.)  Specifically, she points to RFC language stating Mr. Mills "should avoid heavy machinery," and argues that such a limitation is incompatible with work as an automobile salesperson because the DOT indicates that the job includes: "[e]xplain[ing] features and demonstrat[ing] operation of the car in showroom or on the road."  (*Id.* at p. 15.)  The Commissioner argues in response that the VE addressed this concern when she testified based on her own experience that an automobile salesperson does not typically drive cars.  (ECF Doc. 10, pp. 10-11 (citing Tr. 42).)

  In fact, Plaintiff's attorney asked the VE whether the automobile salesperson job "typically involve[s] driving automobiles," and the VE testified based on her "experience and observation of the position" that "no, the automobile salesperson is dealing with the customers and the sales" while other staff typically "move any vehicles or bring the vehicles to the customer."  (Tr. 42.)  In response to a follow up question whether an automobile salesperson would have to "move cars around or go get a car that a customer wanted to test drive," the VE answered "[t]ypically no"; while such a thing "might happen on an occasional basis," the VE testified that she would not include such a duty "as a part of the job description."  (Tr. 42-43.) Thus, the VE provided testimony to support a finding that Mr. Mills's past relevant work did not require operation of a motor vehicle, which the ALJ "accepted in accordance with SSR 00-4p" when she found that Mr. Mills could perform his past work.  (*See* Tr. 28.)  Accordingly, to the

extent that periodically driving an automobile may be construed as inconsistent with an RFC requiring a person to "avoid heavy machinery,"[3] the record clearly shows that the ALJ resolved that conflict as required.  *See* SSR 00-4p, 65 Fed. Reg. 75,759; *Conn*, 51 F.3d at 610.

For the reasons set forth above, the record does not support a finding that the ALJ failed to comply with the requirements of SSR 00-4p.  Accordingly, the undersigned finds the second assignment of error to be without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.


September 24, 2024


*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge



## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

---

[3] Plaintiff's argument relies upon an assumption that driving an automobile is incompatible with avoiding "heavy machinery."  (ECF Doc. 8, pp. 14, 15.)  Plaintiff has not cited authority for such an assumption, and Plaintiff's counsel did not elicit testimony to address whether the VE equated driving an automobile with exposure to "heavy machinery."  (*See* Tr. 42-43.)  It need not be addressed here whether Plaintiff has sufficiently demonstrated an unresolved conflict that must be addressed under SSR 00-4p, since the record clearly shows that any such conflict was appropriately resolved.